## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **EVANGELICAL BENEFIT TRUST,** ) | |
| **BRANDSOURCE BENEFIT TRUST,** ) | |
| **CALPASC GROUP BENEFIT TRUST,** ) | |
| **TRUST FOR CMTA, THE CUSTOM** ) | |
| **RAIL EMPLOYER WELFARE TRUST** ) | |
| **FUND, IDA GROUP BENEFIT TRUST,** ) | **No. 09 C 4004** |
| **IEC GROUP BENEFIT TRUST, MIDAS** ) | |
| **DEALERS EMPLOYEE BENEFIT** ) | |
| **TRUST, N3A GROUP BENEFIT** ) | **Judge Ronald A. Guzmán** |
| **TRUST and PREMIER CLUB** ) | |
| **BENEFIT TRUST,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LLOYD'S UNDERWRITERS** ) | |
| **SYNDICATE NOS. 2987, 1607, 1183** ) | |
| **and 2001,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

This breach of insurance contract case is before the Court on: (1) plaintiffs' motions to strike defendants' expert testimony and supplement the record; (2) plaintiffs' motion for summary judgment on Counts I, II, VI and VII of their complaint and Count III, the only remaining count of defendants' amended counterclaim; (3) defendants' motion for summary judgment on Counts I, II, VI and VII of plaintiffs' complaint;[1] and (4) third-party defendant Ronald J. Wilson & Associates' motion for summary judgment on Counts I-V of the amended third-party complaint.   For the

---

[1]Defendants do not expressly limit their motion to these counts, but because they do not address any others, the Court construes their motion as limited to these counts.

reasons set forth below, the Court strikes as moot plaintiffs' motions to strike and supplement, denies plaintiffs' motion for summary judgment, grants in part and denies in part defendants' motion for summary judgment and denies third-party defendant's motion for summary judgment.

## Facts

Plaintiffs Evangelical Benefit Trust ("EBT"), Brandsource Benefit Trust ("Brandsource"), CALPASC Group Benefit Trust ("CALPASC"), Benefit Trust for CMTA ("CMTA"), Custom Rail Employer Welfare Trust ("CREW"), IDA Group Benefit Trust ("IDA"), IEC Group Benefit Trust ("IEC"), Midas Dealers Employee Benefit Trust ("Midas"), N3A Group Benefit Trust ("N3A") and Premier Club Benefit Trust ("Premier") are multi-employer welfare association trusts established to secure health benefits for the employees of participating employers. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 2.) Defendants are underwriters with Lloyd's, a British insurer, that issued identical, or virtually identical, certificates of insurance to plaintiffs. (*Id.* ¶¶ 1, 3-5.) Third-party defendant Ronald J. Wilson & Associates ("RJW") was defendants' coverholder, *i.e.*, the entity authorized to bind insurance on their behalf, for the Trusts. (*Id.* ¶ 18; *see* Pls.' LR 56.1(a) Stmt., Ex. R, RJW Medical Benefits Binding Authority ("Binding Authority").) Ronald J. Wilson is the majority shareholder and president of RJW. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 15-16.)

Subject to certain conditions and limitations, the certificates: (1) require defendants to "reimburse [plaintiffs] for Claims Incurred by [them] under the terms and provisions of the Summary Plan Description provided to employees of the participating employers of the . . . Trust (hereinafter referred to as the 'Program') during the [insurance] period"; (2) make defendants directly liable to program participants for claims incurred that are not paid in full by plaintiffs within thirty days after final claim determination ("30+ claims"); (3) makes defendants liable, if a plaintiff

2

becomes insolvent, for claims incurred during the insurance period that exceed the terminal fund; and (4) makes defendants liable, if a program terminates or is not renewed, for claims incurred during the insurance period that exceed the terminal fund. (Jones Aff. Mar. 25, 2011, Ex. 3, Brandsource Certificate of Insurance ("Certificate"), Insuring Clause, Limits of Liability 2, 4-5.) The insurance period for were: (1) December 1, 2005 to December 1, 2006 for CREW; (2) May 1, 2006 through September 1, 2007 for Brandsource, EBT and N3A; (3) June 1, 2006 to September 1, 2007 for Midas; (4) September 1, 2006 to September 1, 2007 for IDA; (5) October 1, 2006 to October 1, 2007 for Premier; (6) November 1, 2006 to November 1, 2007 for IEC; (7) February 1, 2007 to February 1, 2008 for CALPASC; and (8) April 1, 2007 to April 1, 2008 for CMTA. (Am. Answer ¶ 23.)

Each of the Trusts appointed either Medical Benefits Administrators of Maryland ("MBA") or Dayspring Management LLC ("Dayspring") as its plan administrator and MBA or Insurers Administrative Corporation ("IAC") as its claims administrator. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 49, 58, 60-61.) Ron Wilson is the Chief Executive Officer of MBA and a Managing Director of Dayspring. (*Id.* ¶¶ 52, 63.)

The plan administrators adopted virtually identical summary plan descriptions ("SPDs") for the benefit plan associated with each Trust, all of which contain the following provision:

> **Subrogation/Right of Reimbursement.** As a condition to receiving benefits under this Plan, Plan Participant(s) agree to transfer to the Plan their rights to recover damages to the extent of benefits paid by the Plan when an Injury or Illness occurs through the act or omission of another person. If a Plan Participant received payment from another person or business entity because of an Injury or Illness, Plan Participant agrees to reimburse the Plan to the full extent of benefits paid. If a repayment agreement is required to be signed, all rights of recovery are transferred to the Plan regardless of whether it is actually signed. It is only necessary that the Injury or Illness occur through the act or omission of another person. The Plan's rights of full recovery may be from a third party, any liability or other insurance

3

covering the third party, the Plan Participant's own uninsured motorist insurance, underinsured motorist insurance, any medical payments, no-fault or school insurance coverage's [sic] which are paid or payable. The Plan may enforce its reimbursement rights by requiring the Plan Participant to assert a claim to any of the foregoing coverage to which he/she may be entitled. Plan Participant(s) shall provide all requested accident and insurance information to Plan representatives. . . .

(Defs.' LR 56.1(b)(3)(B) Stmt. ¶¶ 17, 20; *see* Pls.' LR 56.1(a) Stmt., Ex. D1B, Brandsource SPD,

§ XI(2)(d).)

On May 10, 2007, defendants told plaintiffs they would not issue them new certificates of insurance when the current certificates expired. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 86.) After the certificates expired, all of the Trusts, except CMTA, obtained other insurance and continued to provide benefits to plan participants. (*Id.* ¶¶ 88-89.)

In June 2009, Ron Wilson filed this suit on behalf of the Trusts to recover money defendants purportedly owe to them under the certificates.

## Discussion

## Motions to Strike and Supplement

Plaintiffs move to strike as untimely the expert testimony of David Ives and to supplement the record with additional evidence on their Count VII claim. Because Ives' testimony is not required to resolve any issue in the parties' summary judgment motions, and the additional evidence is not sufficient to do so, the Court strikes both motions as moot.

## Summary Judgment

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

4

Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Authority to Sue

Defendants argue that Ron Wilson, who filed this suit on the Trusts' behalf, lacked the authority to do so because he is not, and never has been, one of the Trusts' trustees.[2] The trust documents and the law that governs them give the trustees power to file suit. (Pls.' LR 56.1(a) Stmt., Ex. G1, Brandsource Agreement & Decl. of Trust ("Trust"), Art. VII, § 1(e) (giving the trustees power to take any legal action that is "necessary [to] . . . protect[] . . . the Trust, the Fund . . . or to secure the benefits contemplated [by the Trust]"); *id.*, Art. XV, § 1 (stating that the law of the District of Columbia governs "all questions pertaining to [the] validity, construction and administration" of the Trust); *see* DC Code § 19- 1308.16 (24) (stating that a trustee may "[p]rosecute or defend an action, claim, or judicial proceeding in any jurisdiction to protect trust property"). But, as defendants admit, they also permit the trustees to delegate various powers. *Id.*

---

[2]At least, that is what the Court has distilled from defendants' arguments, which conflate the issues of standing, capacity to sue and real party in interest and apply the melange both to Wilson and the Trusts. (*See* Defs.' Mem. Supp. Mot. Summ. J. 7 (arguing that the "trusts lack standing to sue because . . . the trustees are necessary parties to this action") *id.* 9 (asserting that Wilson is not "a real party in interest with the capacity to sue on the . . . trusts' behalf"); Defs.' Reply Mem. Supp. Mot. Summ. J. 2-4 (disavowing any real-party-in-interest objection and arguing that "Wilson lacks the authority to prosecute actions on the Trusts' behalf" and "*lacks standing* to assert these claims" (emphasis original)).

§ 19-1308.07(a) (stating that "[a] trustee may delegate duties and powers that a prudent trustee of comparable skills could properly delegate under the circumstances"); (Pls.' LR 56.1(a) Stmt., Ex. G1, Brandsource Trust, Art. VII, § 1(g) (stating that the trustees may "delegate such of their administrative or ministerial duties and powers to . . . agents . . . as may, in the opinion of the Trustees, be advisable."); *see* Defs.' Reply Mem. Supp. Mot. Summ. J. 4 ("[Defendants] do not dispute plaintiff's general contention that a trust may delegate its authority to sue another party." (emphasis omitted)).)  Moreover, there is no dispute that the trustees did so by entering into administration agreements with plan administrators Dayspring and MBA. (Defs.' LR 56.1(b)(3)(B) Stmt. ¶¶ 98-100; Jones Aff. Mar. 25, 2011, Ex. 16, Administration Agreement between Brandsource and Dayspring ("Administration Agreement").)  Defendants argue, however, that the duty to file lawsuits for the Trusts was not one the trustees delegated.

The Court disagrees.  The Administration Agreement delegates to the plan administrators:  (1) the powers and duties set forth in Article X of the Trust, including the duty "to perform any and all functions which may from time to time be mutually agreed with the Trustees"; and (2) the power to "[s]ubmit and collect all eligible claims due from the insurers of the Plan or Plans on behalf of the Trust." (Jones Aff. Mar. 25, 2011, Ex. 16, Administration Agreement, Art. I(A), (11); Pls.' LR 56.1(a) Stmt., Ex. G1, Trust, Art. X, § 2(m).)  Given the language of these provisions and the lack of evidence to suggest that, in spite of it, the trustees somehow reserved to themselves the power to sue, defendants are not entitled to judgment on the grounds that Wilson lacked authority to file this suit.

Alternatively, defendants argue that the Trusts cannot pursue their claims because they no longer exist, an assertion based on plaintiffs' Rule 30(b)(6) testimony to that effect.  (*See* Jones Aff.

6

Mar. 25, 2011, Ex. 4, Pls.' Rule 30(b)(6) Dep. 23-40, Aug. 24, 2010 (testifying that Brandsource, CALPASC, CMTA, IDA, IEC and Premiere no longer exist).) Rule 30(b)(6) testimony, however, does not constitute a judicial admission. *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). Rather, such testimony, "like any other deposition testimony, can be contradicted." *Id.* (quotation omitted).

The contradiction here is provided by: (1) the Rule 30(b)(6) witness' contention that he thought counsel was referring to the benefit plans associated with the trusts when he asked whether the trusts still existed; (2) the Trust documents, which permit a Trust to be terminated by a majority of the trustees with the consent of two-thirds of the Trust employers; (3) the law governing the trusts, which requires trustees to notify beneficiaries of trust termination; and (4) the lack of evidence to suggest that the actions necessary to terminate the trusts occurred. *See* D.C. Code § 19-1308.13(c)(1); (R. Wilson Aff. May 25, 2011 ¶¶ 4-8; Pls.' LR 56.1(a) Stmt., Ex. G1, Brandsource Trust, Art. XII). Consequently, the record does not establish that any of the Trusts has been terminated.

## **CMTA**

Unlike the other Trusts, the only damages CMTA seeks to recover for defendants' alleged contractual breaches are the costs of conducting two annual audits. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 119.) The certificate, however, which CMTA admits is the sole basis for its contract claim, does not require defendants to pay such costs. (*Id.* ¶ 120; *see generally*, Jones Aff. Mar. 25, 2011, Ex. 3, Certificate.) Thus, defendants are entitled to judgment as a matter of law on CMTA's claims.

**CREW & Premier**

Defendants contend that they settled the claims that CREW asserted against them in this suit. It is undisputed that defendants entered into an agreement with CREW that states: "[CREW] fully and finally release[s] [defendants] from any and all known or unknown claims, demands, and costs whether past, present, or future which CREW . . . ha[s] now or but for this discharge might have against [defendants] arising directly or indirectly out of the CREW Trust." (Jones Aff. Mar. 25, 2011, Ex. 36, Letter from Ives to Wilson (Oct. 29, 2008).) The agreement also states, however, that it is a "resolution of disputes relating to claims made under . . . policy [Certificate NL2006-12]," effective "December 1, 2006-November 30, 2007." (*Id.*) As defendants admit, the Crew certificate at issue in this case is "L571808 for Period 1st December 2005 to 1st December 2006." (Am. Answer ¶ 23.) Because there is no evidence that CREW released any claims arising from the L571808 certificate, defendants' motion for summary judgment on this basis is denied.

Defendants fare no better with their contention that Premier settled its claims against them. As support for this argument, defendants offer a 2007 email exchange among Gavin Richards, a broker who worked for Premier, Mark Cassidy, who worked for defendants, and Jeff Wilson of third-party defendant RJW. (*See* Jones Aff. Mar. 25, 2011, Ex. 39, Emails among Richards, Cassidy & J. Wilson (Sept. 28, 2007).) In the first email, Richards tells Cassidy that "Mark Clements [of AMLIN] has agreed to renew subject to the prior carrier (BRIT) agreeing to pay $280,670 . . . . The $280,670 does not need to be physically paid before renewal, however agreement from Brit would mean the new RJW facility would take this risk going forward and avoid terminal liability." (*Id.*) Cassidy responds by saying: "I can confirm that we agree to pay $280,670 cash call per the subjectivity on the Amlin quote. Please draw up a collection form and give it to me today." (*Id.*)

Richards then forwards Cassidy's email to Wilson, who responds: "Great work, Gavin. Thank you." (*Id.*) These emails, which do not refer to an insuring certificate, explain what Amlin is or what it has agreed to do, set forth the terms of the promised renewal or suggest that any of the actions discussed actually occurred, do not establish that Premier released defendants from the claims it asserts in this suit.

### IAC-Administered Trusts

Defendants argue that the claims of the IAC-administered Trusts – Brandsource, CALPASC, IDA, Midas and N3A – are equally infirm because their damages evidence is inadmissible. *See W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004) ("In order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.").[3] That evidence was provided by Erin Bennett, a certified public accountant who works for defendant MBA and third-party defendant RJW. (Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 102; Pls.' LR 56.1(a) Stmt., Ex. E, Bennett Dep. 9-12, Oct. 12, 2010.) Bennett calculated damages by: (1) determining the amount of the terminal fund for each trust by adding up "cash, contributions receivable, prepaid expenses, any other deposits . . . on hand, and then . . . subtract[ing] nonclaim liabilities like administrative payable, premium that was due . . . , taxes . . . , audit fees [and] life insurance payables"; and (2) subtracting from the terminal fund claims that were incurred prior to the expiration of the certificates but had not been paid. (Pls.' LR 56.1(a)

---

[3]Following the parties' lead, the Court assumes that Illinois law governs the contract claims.

9

Stmt., Ex. E, Bennett Dep. 133-34, Oct. 12, 2010.) For MBA-administered Trusts, Bennett obtained the amount of the unpaid incurred claims from the claims analysis report created by an MBA software program. (*Id.* 134.) For the IAC-administered Trusts, "the outside actuary [Paul Hanson] obtained those numbers from IAC's actuarial firm." (*Id.* 135, 144.) Because, as Bennett admits, she did not verify the numbers Hanson provided, defendants say her testimony about the damages incurred by the IAC-administered Trusts cannot be considered. (Jones Aff. Mar. 25, 2011, Ex. 20, Bennett Dep. 220-22, Oct.13, 2010.)

The Court disagrees. Federal Rule of Evidence 703 permits experts to rely on any information that "experts in the . . . field would reasonably rely on . . . in forming an opinion." *Id.* Plan administrators routinely rely on claims data provided by actuaries. *See, e.g.*, *Actuarial Standards Board, Actuarial Standard of Practice No. 5, Incurred Health & Disability Claims* (May 1, 2011), *available at* http://www.actuarialstandardsboard.org/pdf/asops/asop005_126.pdf. Indeed, Bennett testified that throughout the certificate period, MBA used information provided by IAC's actuary to maintain the general ledgers of the IAC-administered Trusts. (Pls.' LR 56.1(a) Stmt., Ex. E, Bennett Dep. 145-46, Oct. 12, 2010.) Thus, Bennett's failure to verify IAC's numbers does not make her testimony inadmissible. *See Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, No. 4:06-CV-00124-PRC, 2008 WL 7404647, at *3 (N.D. Ind. July 3, 2008) ("Mr. Del Principe, as an expert testifying to damages, was not required to independently investigate and verify the accuracy and reliability of facts and data provided to him.").

**Attorneys' Fees**

Among the relief plaintiffs seek is attorneys' fees, a request that the parties agree is governed by the following condition of the certificates:

> The [Trust] shall be responsible at their own cost and expense for the investigations, settlements or defense of any claims made or suit brought or proceedings instituted against the [Trust].

> [Defendants] at their own election and expense shall have the right to participate with the Assured in the defense or appeal of any action, suit or proceedings as a result of which they may, in their sole judgment, be come liable for payment under the insurance.

(Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Condition 2.)  Plaintiffs contend that defendants elected to participate in the defense suits, actions and proceedings within the meaning of this provision, by authorizing RJW "to assess and settle Claims up to USD 100,000 [that] fall strictly within the Certificate terms and conditions." (Pls.' LR 56.1(a) Stmt., Ex. R, Binding Authority § 24; *see id.*, Ex. Q, Richards Dep. 115, July 7, 2010 & Dep. Ex. 19 Letter from Richards to R. Wilson (Dec. 16, 2009) (stating that "[a]s a matter of practice," the cost of RJW's obtaining "legal advice relating to the payment of a claim or possible claim under [the certificates would be] reimbursed by the participating Syndicates. . . . even if the final amount paid does not reach the Assureds [sic] specific excess of loss self insured retention (S.I.R.) or deductible").)  In other words, plaintiffs contend that the "claim" is synonymous with "action," "suit" and "proceedings."

This contention, however, runs counter to the several basic tenets of contract interpretation:  The words of a contract are purposefully chosen, each has meaning and their meaning is derived from the context in which they are used.  *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *Gallagher v. Lenart*, 874 N.E.2d 43, 58, (Ill. 2007); Restatement (Second) of Contracts § 203(a). Viewed in light of these principles, the fact that "claims," a term of art in the insurance industry,

appears in the first paragraph of Condition 2 but not in the second, suggests that the omission was intentional. *See A.M. Best Company, Glossary of Insurance Terms, available at* http://www.ambest.com/resource/glossary.html#C (defining "claim" as "[a] demand made by the insured . . . for payment of the benefits as provided by the policy").

For purposes of these motions, however, it does not matter because the parties do not identify the evidence, if any, that establishes when, why and in connection with what claim or proceeding the contested legal fees were incurred. Thus, the Court denies both parties' motions for summary judgment on this issue.

**Breach of Contract**

In Count I, EBT, IEC, Brandsource, CALPASC, CREW, N3A, IDA, Midas and Premier (collectively "Trusts" or "plaintiffs") allege that defendants breached the duty set forth in Limit of Liability ("Limit") 5 to pay for claims incurred during the insurance period that exceed the terminal fund if "the Program" is terminated or not renewed. (*See* Jones Aff. Mar 25, 2011, Ex. 3, Certificate, Limit 5.) The certificate's insuring clause defines "Program" as "the terms and provisions of the Summary Plan Description provided to the employees of the participating employers of [the Trust]." (*Id.*, Insuring Clause.) Plaintiffs contend that definition is untenable in light of Limit 5, which addresses defendants' liability "in the event of [Program] termination or non-renewal," and the undisputed fact that SPDs are not subject to "non-renewal." (*Id.*, Limit 5; *see* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 40.) Instead, they argue that "Program" refers to the combination of the SPD, the Trust and the certificate, none of which "[can] operate without the other," and thus,

12

the Programs ended when the certificates expired. (*See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 85; Pls.'

Mem. Supp. Mot. Partial Summ. J. 14.)

Plaintiffs' own evidence and admissions, however, refutes their claim that the SPDs, Trusts

and certificates cannot stand alone. They admit, for example, that the Trusts continued to provide

benefits pursuant to the SPDs after the certificates expired, and they offer evidence that suggests the

Trusts are still viable, though some or all of the benefit plans are not. (*See* Pls.' LR 56.1(b)(3)(B)

Stmt. ¶¶ 88-89, 118, 122, 128, 134, 146, 149, 150, 153 (denying that the Trusts were terminated);

R. Wilson Aff. May 25, 2011 ¶¶ 4-8 (explaining that he thought counsel was referring to the benefit

plans associated with the Trust when he asked Wilson during the Rule 30(b)(6) deposition whether

the Trusts still existed); Jones Aff. Mar 25, 2011, Ex. 4, Pls.' Rule 30(b)(6) Dep. 23, 25, 29-30, 32,

34, 40, Aug. 24, 2010 (testifying that Brandsource ended around "May of 2009," the CALPASC

ended "around February 2009," CREW existed as of August 24, 2010, IDA ended in April 2010,

IEC ended in 2010 and Premier ended in June 2010); Jones Aff. May 6, 2011, Ex. 5, Pls.' Rule

30(b)(6) Dep. 18, 36-38, Aug. 24, 2010 (testifying that EBT and Midas existed as of August 24,

2010 and the N3A benefit plan ended in "early 2009"); *see also* discussion *supra* p.7, Authority to

Sue).

The interdependence premise is also refuted by other provisions of the certificates. *See*

*Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1004 (Ill. 2010) (stating that insurance policies must

be interpreted as a whole). Condition 13, which sets forth the parameters of defendants'

termination/non-renewal liability, explicitly distinguishes between the "Program" and the

"Certificate." (*See* Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Condition 13 ("The termination or

non-renewal of the Program shall not otherwise impose upon [defendants] any liability other than

the liability specified in the Certificate, or any valid endorsement to th[e] Certificate.").)  The same is true for the assignment requirement set forth in Condition 9.  (*Id.*, Condition 9 ("The [Trust] or the Claims Administrator shall assign its rights under this Certificate with respect to a specific Incurred Claim that has been determined to be properly covered under the Program pursuant to the Program's review process and that has not been paid in full within 30 days after final determination.").)  Moreover, the description of the Program set forth in various other parts of the certificates can only refer to a benefit plan.  (*See id.*, Limit 2, Warranty 1, Definition 1, Condition 2, Schedule Item 10 (referring to "[the Program's] claim review procedure," stating that "the  terms and provisions of the Program shall . . . at all times be . . . in accordance with the [Plan Document]" and "[p]ayments [made] under the Program shall be administered by . . . [the] Claims Administrator" and defining "Claims Incurred" as "properly covered Program costs [for] medical treatment, diagnosis or advice").)  In short, Limit 5's reference to non-renewal, though inapt, does not change the plain meaning of the term "Program" – "the terms and provisions of the Summary Plan Description provided to the employees of the participating employers of [the Trust]" –  as the insuring clause of the certificates define it.  (*See id.* Insuring Clause.)

Moreover, the record establishes that the "Programs," so defined, did not terminate when the certificates expired.  (*See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 88-89 (admitting that plaintiffs obtained other insurance and continued to provide benefits pursuant to the SPDs after expiration of the certificates).)  But it does not establish when, or even if, termination occurred.  (*Compare* Pls.' LR 56.1(a) Stmt. ¶ 84 (asserting that "[a]ll of the employee benefit plans associated with the Trusts have been terminated"), *with* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 84 (denying that assertion); *see* R. Wilson Aff. May 25, 2011 ¶¶ 4-8; Jones Aff. Mar. 25, 2011, Ex. 4, Pls.' Rule 30(b)(6) Dep. 23, 25, 29-30,

32, 34, 40, Aug. 24, 2010; Jones Aff. May 6, 2011, Ex. 5, Pls.' Rule 30(b)(6) Dep. 18, 36-38, Aug. 24, 2010). Because there are genuine disputes as to whether and when the Programs terminated, the Court denies both parties' motions for summary judgment as to Count I.[4]

In Count II, plaintiffs allege that defendants breached Limit 4 of the certificate, which states: "In the event of insolvency, bankruptcy, financial impairment, receivership, voluntary plan of arrangement with creditors, or dissolution of the [Trust] . . . [Defendants] shall be liable for Claims Incurred during the Period of Insurance which exceed the Terminal Fund." (*See* Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Limit 4.) The certificate does not define "insolvency," and the parties' definitions diverge.

Plaintiffs contend that the dictionary definition, the condition of "having insufficient assets to meet debts and liabilities," applies. (Pls.' Mem. Supp. Mot. Partial Summ. J. 12); *Collins English Dictionary* (10th ed. 2009), *available at* **http://dictionary.reference.com/browse/insolvent**. Defendants argue that, in this context, insolvency means a permanent inability to pay debts rather than "a temporary financial problem." (Defs.' Mem. Supp. Mot. Summ. J. 18-19.)

The Court agrees with defendants for several reasons. First, the word "insolvency" "take[s] color" from the other terms in Limit 4, all of which describe enterprises that have failed or are on the brink of doing so. *Woods v. Great Am. Ins. Co.*, No. 8,575, 265 Ill. App. 20, 23, 1932 WL 2726, at *2 (Ill. App. Ct. Feb. 1932); *see Collins English Dictionary* (10th ed. 2009), *available at* **http://dictionary.reference.com/browse/** (defining bankrupt as "financially ruined," "receivership" as "the condition of being administered by" a "person appointed by a court to manage property . .

---

[4]Because it is impossible to determine whether any Program terminated, the Court need not address defendants' contention that plaintiffs' failed to fulfill a condition precedent to termination coverage. (*See* Defs.' Mem. Supp. Mot. Summ. J. 21-24.)

. after the owner(s) has been declared bankrupt"; and dissolution as "the termination of a formal or legal relationship, such as a business enterprise"); A.M. Best Company, Inc., Best's Credit Rating Methodology, Global Life and Non-Life Insurance Edition (2011), *available at* http://www.ambest.com/ratings/methodology/bcrm.pdf (stating that an insurer is financially impaired  if it is in "involuntary liquidation because of insolvency, . . . [under] supervision, rehabilitation, receivership [or] conservatorship, [has been given] a cease-and-desist order, suspension, license revocation [or] administrative order" or is subject to any other action that restricts its ability to  conduct business normally); *see generally* Insolvency Act 1986, c. 45, (Eng.), *available at* **http://www.legislation.gov.uk/ukpga/1986/45/part/I** (setting forth the requirements for and consequences of, entering into a Company Voluntary Arrangement with Creditors).

Second, if insolvency is a temporary condition, then Limit 3 is redundant of Limit 4.  The former makes defendants liable for incurred claims that the Trusts do not pay within thirty days of final claim determination.  (Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Limit 3.)  The latter makes defendants immediately liable upon a Trust's insolvency for all unpaid, incurred claims.  (*Id.*, Limit 4.)  Thus, if the Court were to hold that a Trust is insolvent when its debts exceed its assets for any period of time, then Limit 3's thirty-day delay of liability would be meaningless.  If, on the other hand, a Trust is insolvent only when its current assets and those that it reasonably expects to generate from normal business operations are insufficient to meet its liabilities, then Limits 3 and 4 both have effect.  For all of these reasons, the Court holds that a Trust is insolvent, within the meaning of Limit 4, if does not have sufficient assets to pay its liabilities and there is no reasonable expectation that, in the ordinary course of business, it ever will.

The Trusts assert that they were insolvent in this sense when the certificates expired because, at that time, they had deficits ranging from about $28,000.00 to more than $3 million. (Pls.' LR 56.1(a) Stmt. ¶ 88.) Even if that is true, however, and defendants contend it is not, plaintiffs also admit that a Trust with a deficit is not insolvent if collectible insurance or contributions will cover the shortfall. (*See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 121, 123-24, 139.) The record does not show whether the insurance plaintiffs obtained and contributions they collected after the certificates expired were sufficient to cover any shortfall. Thus, neither party has established that it is entitled to judgment as a matter of law as to the claims in Count II.[5]

In Count VI, plaintiffs EBT, CREW, IEC and Premier[6] allege that defendants breached their duty to pay 30+ claims as required by Limit 2.[7] (*See* Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Limit 2 (stating that defendants "shall . . . be directly liable to the covered employees of the participating employers of the Program . . . for Claims Incurred that have not been paid in full by the [Trusts] within 30 days of final determination under the Program's claim review procedure.").

---

[5]Defendants also argue that they are entitled to judgment on the claims in Counts I and II because the Trusts did not give them timely notice of these claims. (*See* Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Condition 5 ( "[T]he [Trust] . . . waives any rights to recover from [defendants] . . . where written notification . . . is not given . . . within 180 days of the Claims Paid date . . . .").) Defendants do not, however, cite any evidence to support the premise of this argument, that the "trusts did not provide written notice . . . until . . . March 10, 2009." (Defs.' Mem. Supp. Mot. Summ. J. 21.) Accordingly, their motion for summary judgment on this basis is denied.

[6]Plaintiffs Brandsource, CALPASC, IDA, Midas and N3A, the IAC-administered Trusts, concede that they cannot prove their Count VI claims. (*See* Pls.' Mem. Supp. Mot. Partial Summ. J. 17 n.6.) Thus, the Court grants defendants' motion for summary judgment as to these claims.

[7]Plaintiffs do not allege that defendants breached Limit 3, which makes defendants liable to *plaintiffs* for, among other things, 30+ claims. (*See* Jones Aff. Mar. 25, 2011, Defs.' Ex. 3, Certificate, Limit 3.)

Though Limit 2 expressly makes defendants liable to plan participants for 30+ claims, plaintiffs argue that they have both a contractual and a common law right to enforce it.

Plaintiffs contend that the contractual right arises from the subrogation/right of reimbursement clause in the SPD, which provides:

> As a condition to receiving benefits under the Plan, Plan Participant(s) agree to transfer to the Plan their rights to recover damages to the extent of benefits paid by the Plan *when an Injury or Illness occurs through the act or omission of another person.* If a Plan Participant received payment from another person or business entity because of an Injury or Illness, Plan Participant agrees to reimburse the Plan to the full extent of benefits paid. If a repayment agreement is required to be signed, all rights of recovery are transferred to the Plan regardless of whether it is actually signed. *It is only necessary that the Injury or Illness occur through the act or omission of another person.* The Plan's rights of full recovery may be from a third party, any liability or other insurance covering the third party, the Plan Participant's own uninsured motorist insurance, underinsured motorist insurance, any medical payments, no-fault or school insurance coverage's [sic] which are paid or payable. The Plan may enforce its reimbursement rights by requiring the Plan Participant to assert a claim to any of the foregoing coverage to which he/she may be entitled. Plan Participant(s) shall provide all requested accident and insurance information to Plan representatives.

(Pls.' LR 56.1(a) Stmt., Ex. D, SPD § XI(2)(d) (emphasis added).) Having paid the 30+ claims, plaintiffs say this provision allows them to step into the participants' shoes under Limit 2 and collect the 30+ claims from defendants.

By its plain language, however, this clause limits plaintiffs' right of recoupment to benefits paid to participants for illnesses or injuries caused by third parties. Defendants did not cause an illness or injury underlying any 30+ claim or insure a person or entity who did. Thus, the SPD's subrogation clause does not permit plaintiffs to enforce the participants' Limit 2 right to collect 30+ claims from defendants. Moreover, the existence of the unambiguous contract clause bars application of the common law doctrine. *Benge v. State Farm Mut. Auto. Ins. Co.*, 697 N.E.2d 914, 920 (Ill. App. Ct. 1998) ("Where the right is created by an enforceable subrogation clause in a

18

contract, the contract terms, rather than common law or equitable principles, control."); *see Am. Family Mut. Ins. Co. v. N. Heritage Builders, L.L.C.*, 937 N.E.2d 323, 327 (Ill. App. Ct. 2010) (citing *Benge* and stating that "common law or equitable subrogation cannot stand in the face of an express contractual right of subrogation"), *appeal denied*, 943 N.E.2d 1099 (2011). Because, as a matter of law, plaintiffs cannot enforce the participants' Limit 2 right to recover from defendants for 30+ claims, defendants are entitled to summary judgment on Count VI.

In Count VII, plaintiffs allege that defendants acted in bad faith when they breached Certificate Limits 2, 4 and 5, as alleged in Counts I, II and VI. Illinois recognizes both a common law and a statutory cause of action against an insurer for bad faith. The common law claim, however, can only be asserted by a third party seeking to recover against an insured, not by the insured itself. *See Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 901-03 (Ill. 1996). Thus, plaintiffs can recover, if at all, only under the statute, which provides:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
> (b) $60,000;
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 Ill. Comp. Stat. 5/155. An insurer's conduct is not unreasonable and vexatious if, among other things, "there is a bona fide dispute concerning the scope and application of insurance coverage . . . the insurer asserts a legitimate policy defense . . . [or] the claim presents a genuine legal or factual

19

issue regarding coverage." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (citations omitted).

Given the Court's determination that defendants did not breach their Limit 2 duty to pay 30+ claims as alleged in Count VI, any bad faith claim premised on that alleged breach also fails. Moreover, though the Court agrees with defendants' interpretation of Limits 4 and 5, factual disputes preclude the Court from determining, as a matter of law, whether defendants breached these provisions or did so in bad faith. Thus, defendants' motion for summary judgment on the portion of Count VII that is premised on the breaches alleged in Counts I and II is denied.

## Defendants' Counterclaim

In the sole remaining counterclaim, Count III, defendants allege that plaintiffs breached their obligations under the certificates "to maintain a Terminal Fund with assets on hand to fund the actuarial value of all incurred but unpaid claims, including incurred but not reported claims (i.e. IBNR)." (Countercl. ¶ 9.)[8] Plaintiffs' obligation to maintain a terminal fund is a condition to coverage under Limit 5 for Program termination or non-renewal. (*See* Jones Aff. Mar. 25, 2011, Ex. 3, Certificate, Limit 5, Condition 13.) Thus, unless and until a jury determines that a Program terminated, this claim is not ripe for decision.

---

[8]The Court did not dispose of this counterclaim on a motion to dismiss, as plaintiffs contend. Rather, the Court dismissed a prior version of the claim, in which defendants alleged that plaintiffs breached the certificates "by failing to maintain an adequate Terminal Fund." (*See* Mem. Opinion & Order 6, Jan. 13, 2010.) The certificates do not require plaintiffs to have "an adequate" terminal fund but require that they have "current assets on hand to fund the actuarial value of all incurred bu unpaid claims (including incurred but not reported claims i.e. IBNR)," which is precisely the obligation that the counterclaim now accuses plaintiffs of breaching.

**RJW's Motion for Summary Judgment**

In its LR 56.1(a) Statement, RJW asserts that it entered into a Binding Authority Agreement with defendants, which consists of International Non-Marine Binding Authority Agreement LMA3004 ("LMA3004") and RJW Medical Benefits Binding Authority Schedule, an assertion that defendants admit. (RJW's LR 56.1(a) Stmt. ¶ 23; *id.*, Exs. A-1 & A-2; Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 23.) Section 39 of LMA3004 states that it "is subject to English law and practice." (RJW's LR 56.1(a) Stmt., Ex. A-1, § 39.) Not surprisingly, in their response to RJW's motion, defendants argue that English law governs the parties' dispute. (*See* Defs.' Resp. Opp'n RJW's Mot. Summ. J. 2-3.) In its reply brief, however, RJW says the parties' contract is not really LM3004, but LM3002, which is "governed by . . . the substantive laws of the State [of Maryland]." (RJW's Reply Supp. Mot. Summ. J. 2-3; *see* Am. Third Party Compl., Ex. A, United States of America Non-Marine Binding Authority LM3002, § 38.) Consequently, the record as it now stands contains a factual dispute as to whether the parties' contract is LM3004 or LM3002.

This dispute not only dooms RJW's motion for summary judgment on the contract claim but raises a myriad of legal issues as well. Are the choice-of-law provisions in LM3004 and LM3002 enforceable? Does federal common law or the law of Illinois, the Court's forum state, play any role the choice-of-law analysis? Does "English law" include that country's choice-of-law principles? Is there an actual conflict between English law and that of Maryland? Does the governing law, whatever it is, control only the contract claim or also the misrepresentation, indemnity and estoppel claims that arise from it? Because the parties do not address these issues, and defendants' claims against RJW cannot be resolved until they are, the Court denies RJW's motion for summary judgment.

**Conclusion**

For the reasons set forth above, the Court: (1) strikes as moot plaintiffs' motions to strike defendants' expert testimony [272] and to supplement the record [288]; (2) finds that there is no genuine issue of material fact as to: (a) the claims plaintiff CMTA asserts against defendants in Counts I, II, VI and VII of the complaint, (b) the claims plaintiffs EBT, Brandsource, CALPASC, CREW, IEC, IDA, Midas, N3A and Premier assert against defendants in Count VI and the portion of Count VII based on the breach alleged in Count VI of the complaint, and defendants are entitled to judgment as a matter of law on these claims; and thus, (3) grants in part and denies in part defendants' motion for summary judgment [238]; (4) denies plaintiffs' motion for summary judgment as to Counts I, II, VI and VII of their complaint and defendants' sole remaining counterclaim, Count III [255]; and (5) denies third-party defendant RJW's motion for summary judgment on Counts I-V of the amended third-party complaint [245].

**SO ORDERED.**                                    **ENTERED: February 3, 2012**


**HON. RONALD A. GUZMAN**
**United States District Judge**